SLIP OPINION

Cite as 2017 Ark. App. 56

# ARKANSAS COURT OF APPEALS

DIVISION III

**No.** E–16–148

BLAKE FOWLKES

APPELLANT

V.

DIRECTOR, DEPARTMENT OF
WORKFORCE SERVICES AND WK
CONTRACTORS, INC.

APPELLEES

**OPINION DELIVERED:** FEBRUARY 1, 2017

APPEAL FROM THE
ARKANSAS BOARD OF REVIEW
[NO. 2016BR–00198]

AFFIRMED

---

## ROBERT J. GLADWIN, Judge

Blake Fowlkes appeals the denial of his application for unemployment benefits, asserting four points on appeal: (1) the Arkansas Board of Review ("Board") erred in concluding that Fowlkes quit his job; (2) Fowlkes's action did not constitute misconduct and did not preclude an award of benefits; (3) the Board erred in concluding that Fowlkes was not available for work; and (4) the Board erred in finding that Fowlkes's delay in filing his initial claim was without good cause or due to extraordinary circumstances. We affirm.

I.    *Facts*

On December 14, 2015, Fowlkes filed an application for unemployment-insurance benefits with appellee Daryl Bassett, Director, Arkansas Department of Workforce Services ("Department"). He stated that he had last worked for WK Contractors, Inc. ("WK"), on October 20, 2015, and that he was discharged for "general" reasons. He also noted that he was not eligible to return to work immediately. However, on a separate but identical form,

SLIP OPINION

Fowlkes indicated that he was available for work immediately. WK responded to the notice, alleging that Fowlkes quit for "general" reasons and that he was discharged for "insubordination."

In an "Able and Available-Claimant Statement," Fowlkes asserted that he was not able or available for work beginning October 20, 2015, through November 18, 2015, because of childcare/other dependent-care arrangements and a death in the family. He stated that his brother had died on October 23, 2015, and that he would not have reported to work during the time indicated if work had been available. In a "Backdating-Claimant Statement," Fowlkes requested backdating his claim filed on December 14, 2015, to October 24, 2015, through the week ending December 12, 2015, indicating that his brother and his father had died within "a couple of weeks of each other."

Fowlkes filed unemployment-benefit claims for the following weeks, stating that he had not been able and available to work during each of the following weeks in 2015: October 24; October 31; November 7−14; November 14−21; and November 21−28. However, for his claim for the weeks of November 28−December 5, December 5−12, and December 12−19, he indicated that he had been able and available to work.

Fowlkes was denied benefits because he was "away from [the] labor market for personal reasons and [was] not available for suitable work." Fowlkes appealed to the Arkansas Appeal Tribunal, and a telephone hearing was held on January 25, 2016. Fowlkes testified that he was terminated from his job as an equipment operator; his work included performing labor, pouring concrete and finishing it; and he last worked for WK on October 20, 2015. He said,

My brother died October 26, and then on November 18, about a month later, my dad died of cancer, and I was helping take care of them. There is other stuff more important at the time, and I began looking for a job soon after November 26. It was not until a couple of weeks later that I applied or verbally spoke to people about jobs, in applying for the job, but no one is hiring in my positions during the winter.

I did not keep working for WK because I was fired. We had gotten in an argument . . . he was belittling one of my coworkers that morning, and I stepped in since I did not like the way he was talking to him. Andy Kelly was one of my bosses. WK stands for Chad Wyatt and Andy Kelly. Andy Kelly was belittling one of my coworkers, and I kind of stepped in and said, there is no reason to be talking to him like that. He turned on me and started cursing at me, and we were outside. Chad Wyatt, the other boss, was trying to cool things down with Andy Kelly and told us to all come in the office. We went in the office and we were talking over the situation and everything was fine, and Andy Kelly started cursing me again, and I said, I am out of here.

I just walked out of the office and was going to let him cool down and come back later. I had a company truck and on my way to the truck, he said, just leave your "f'ing truck," and I took it that I was terminated, so I got my personal stuff out of the truck and started walking. I tried to call them later that week, but no one answered. Then, a coworker brought me my last two checks, so I took it that I was fired. No one told me I was fired. I did not tell anyone that I was quitting. When I walked out of the office, I was just going to leave the situation since I was getting cursed and I did not appreciate the way I was being talked to. I was going to let him cool down and come back. I was going to leave in the truck and come back. I did not ask to leave. I was not told I could leave. I was not told to leave. I did not ask why when they said to leave the truck. I just walked to my truck, and no one came outside and tried to stop me. I was just getting my personal things out of the truck. . . . .

I filed my initial claim on December 14. I did not file it sooner although I had not been working since October 20, because I was dealing with my dad and brother dying and things that were more important, as I thought I had worked for these people for eight years, and my work was never unsatisfactory until now, I guess, I do not know.
. . . .

When I filled out the application on December 14, and a question asked if I could begin working immediately and I answered no, I think we went back and changed that because Ms. Lomerson had told me the same thing that I could begin work immediately, and I think she had me change that because I misunderstood the question. I did not understand what it was talking about after the other questions about the situation, with my dad and stuff. This was the time I was helping my dad

and everything was going back and then I was able to work then, and before that is when I had meant to put no, I could not go back to work immediately and she changed that from that date on that I could go to work immediately. I talked to a couple of people verbally about jobs before I filed my unemployment claim, but no one was hiring, and I do not know the dates I did so.

After the hearing, the administrative law judge ("ALJ") found that Fowlkes voluntarily left his work without good cause connected with the work. Further, the ALJ found that Fowlkes was not available for suitable work, and he had not shown good cause for delay in filing an initial claim. Fowlkes appealed to the Board, which affirmed the ALJ's denial. The Board found as follows:

> Here, the claimant's testimony indicated that another party (the other owner) had already "cooled things down" by the time the claimant left work. By leaving work, the claimant failed to give the employer an opportunity to resolve any continuing problems. As such, the claimant did not take appropriate steps to prevent any alleged mistreatment from continuing and thus has not proven by a preponderance of the evidence that he left last work with good cause connected with the work under Ark. Code Ann. § 11-10-513.
> . . . .
>
> The claimant was also disqualified for benefits under Ark. Code Ann. § 11-10-507(3)(A), as the Department found that the claimant was away from his labor market and thus not available for suitable work during the weeks ending October 24, October 31, November 7, November 14, and November 21, 2015. The claimant had indicated on his initial application for benefits that he could not begin work immediately.
>
> The claimant testified that he could not begin work immediately because of deaths in his family. The claimant testified that his brother passed away on October 26, 2015, and that his father passed away on November 18, 2015. . . . Under Ark. Code Ann. § 11-10-507(3)(D), in the event of the death of an individual's immediate family member, the eligibility requirements of availability for that individual shall be waived for the day of the death and for six (6) consecutive calendar days thereafter.
> . . . .
>
> Thus, the claimant was not available for suitable work for the entirety of the week for the weeks ending October 31, November 7, and November 21, 2015.

The Department also found the claimant ineligible for benefits under Ark. Code Ann. § 11-10-507(3)(A) for the weeks ending October 24 and November 14, 2015. The claimant indicated that he was caring for his ill family members during those weeks. As the claimant was caring for family members during the weeks ending October 24 and November 14, 2015, he was not available for suitable work during those weeks.

. . . .

The claimant testified that the filing of his initial claim was delayed as a result of the deaths in his family. While the Board is again sympathetic to the circumstances faced by the clamant at that time, the clamant has not shown by a preponderance of the evidence that the necessity of caring for his family members prevented him from filing a claim. The clamant filed his initial claim when he determined he was ready to reenter the labor market. Essentially, the claimant delayed the filing of his initial claim until he was no longer unavailable for work under Ark. Code Ann. § 11-10-507(3)(A). This does not constitute good cause for the delay in filing, Regulation No. 14(b)(G) of the Department would have precluded his claim from being backdated to a date earlier than November 30, 2015. However, as the claimant has not shown good cause for the delay in filing, his claim shall not be backdated.

Fowlkes filed a timely notice of appeal, and this appeal followed.

## II. *Standard of Review*

Our court recently established that

[t]he standard of review to be followed in such cases is clear. We do not conduct a de novo review in appeals from the Board of Review. *Snyder v. Dir.*, 81 Ark. App. 262, 101 S.W.3d 270 (2003). In appeals of unemployment-compensation cases, we instead review the evidence and all reasonable inferences deducible therefrom in the light most favorable to the Board of Review's findings. *Id.* The findings of fact made by the Board of Review are conclusive if supported by substantial evidence; even when there is evidence on which the Board of Review might have reached a different decision, the scope of judicial review is limited to a determination of whether the Board of Review could have reasonably reached its decision based on the evidence before it. *Id.* If fair-minded persons could reach the Board of Review's conclusions on the same evidence, then we must affirm its decision. *Id.*

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Barnard v. Dir.*, 2013 Ark. App. 143, at 2 (quoting *Valentine v. Dir.*, 2012 Ark. App. 612, at 3). It is also clear that the credibility of the witnesses and the weight to be accorded their testimony are matters to be resolved by the Board of Review. *Barnard, supra*. Like a jury, an administrative body is free to

believe or disbelieve the testimony of any witness. *Gunter v. Dir.*, 82 Ark. App. 346, 107 S.W.3d 902 (2003).

*Burch v. Bassett*, 2016 Ark. App. 456, at 2–3, ___ S.W.3d ___, ___.

### III.      *Good Cause and Misconduct*

First, Fowlkes argues that the Board erred in concluding that he quit his job without good cause pursuant to Arkansas Code Annotated section 11-10-513 (Repl. 2012), which provides as follows:

> (a)(1) If so found by the Director of the Department of Workforce Services, an individual shall be disqualified for benefits if he or she voluntarily and without good cause connected with the work left his or her last work.
> . . . .
>
> (4) The disqualification shall continue until, subsequent to filing a claim, he or she has had at least thirty (30) days of employment covered by an unemployment compensation law of this state, another state, or the United States.

Ark. Code Ann. § 11-10-513(a)(1) and (4). Fowlkes contends that the Board's finding was not supported by substantial evidence.

Fowlkes points to (1) his initial application for unemployment benefits where he marked that he had been discharged for general reasons; (2) his own testimony that he was terminated without explanation; and (3) a second form stating that "I guess I did quit" and noting the situation with the cursing supervisor. Fowlkes summarizes his departure from WK and contends that he did not voluntarily leave his work, claiming that he peacefully and momentarily walked out of the room and was told to leave the keys to the company truck. He claims that he never quit his job and nothing he said to his employer could be construed as quitting. He urges this court to conclude that the Board disregarded the record

when it concluded that he voluntarily left last work without good cause and that he voluntarily relinquished employment.

Alternatively, in his second point on appeal, Fowlkes argues that, even if the Board was correct in finding that he quit WK, he acted with good cause that was associated with his work and not misconduct. Ark. Code Ann. § 11-10-513(a)(1). Fowlkes claims that he was acting judiciously in attempting to protect a coworker who was being cursed. He had tried to defuse a volatile and abusive situation, which cannot be considered either to constitute quitting employment or misconduct, even if there was a voluntary termination. He argues that he should not be faulted for defusing the situation by a denial of unemployment benefits.

The Board noted that whether Fowlkes quit under section 11-10-513 (discharge for voluntarily leaving work without good cause) or was discharged under section 11-10-514 (discharge for misconduct), the disqualification would bar him from benefits. The Board found that,

> [e]ven if the events were construed in such a manner as to indicate that the owner's instructions to leave the truck constituted a discharge of the claimant, the claimant would have been discharged for misconduct under Ark. Code Ann. § 11-10-514(a), as he was leaving the work without permission. He would thus end up with essentially the same disqualification, as the disqualification period for a disqualification under Ark. Code Ann. § 11-10-514(a) is the same as that for a disqualification under Ark. Code Ann. § 11-10-513. Here the claimant initiated the separation and failed to show good cause for quitting under Ark. Code Ann. § 11-10-513.

Fowlkes argues that there was no evidence that he walked off the job. He contends that he simply walked out of the room and had planned to come back. He also contends that he had been making reasonable efforts to retain his job by de-escalating the cursing.

Fowlkes claims that he was not guilty of misconduct under Arkansas Code Annotated section 11-10-514. He cites *Rollins v. Director*, 58 Ark. App. 58, 945 S.W.2d 410 (1997), where a claimant's actions in telling his coworker to shut up and to stop meddling in his business immediately preceding a fight in which the coworker attacked the claimant were not "misconduct" that disqualified him from receiving benefits. The claimant was found to have acted in self-defense in the fight, and even if the claimant's words were spoken in poor judgment, his actions were not such as to constitute negligence or malicious or willful intent under Arkansas Code Annotated section 11-10-514(a)(1). *Id.*

He also relies on *Rossini v. Director*, where this court explained as follows:

> An individual shall be disqualified for unemployment benefits if she is discharged from her last work for misconduct in connection with the work. Ark. Code Ann. § 11-10-514(a)(1) (Repl. 1999). "Misconduct," for purposes of unemployment compensation, involves: (1) disregard of the employer's interest; (2) violation of the employer's rules; (3) disregard of the standards of behavior which the employer has a right to expect of his employees; and (4) disregard of the employee's duties and obligations to his employer. *Greenberg v. Director*, 53 Ark. App. 295, 922 S.W.2d 5 (1996). To constitute misconduct, however, the definitions require more than mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies, ordinary negligence in isolated instances, or good faith error in judgment or discretion. *Carraro v. Director*, 54 Ark. App. 210, 924 S.W.2d 819 (1996). There must be an intentional or deliberate violation, a willful or wanton disregard, or carelessness or negligence of such degree or recurrence as to manifest wrongful intent or evil design. *Id.* In sum, there is an element of intent associated with a determination of misconduct. *Rollins v. Director*, 58 Ark. App. 58, 945 S.W.2d 410 (1997).

*Rossini v. Dir.*, 81 Ark. App. 286, 289, 101 S.W.3d 266, 268–69 (2003).

Fowlkes argues that he gave undisputed testimony regarding the events that took place on his last day at work at WK. He claims that there was no evidence that he used loud or abusive language, spoke toward the supervisor in a demeaning manner, or violated any company policies or rules. He contends that it cannot be said that his intervention with

his coworker was misconduct as set forth in the four elements described in *Rossini, supra*. Fowlkes asserts that he simply walked out of the office to allow his employer to cool down and was planning to return later. He maintains that he showed no intent to harm WK's interests and that there was no showing that he had done so. As such, he should not be disqualified for benefits.

The Department argues that the Board's decision that Fowlkes left his last work without good cause connected with the work must be affirmed because it is supported by substantial evidence. Ark. Code Ann. § 11-10-513(a)(1). The term "good cause" means a justifiable reason for not accepting the particular job offered. *Hiner v. Dir.*, 61 Ark. App. 139, 143, 965 S.W.2d 785, 787 (1998). To constitute good cause, the reason for refusal must not be arbitrary or capricious, and the reason must be connected with the work itself. *Id.* The question of what is good cause must be determined in the light of the facts in each case. *Id.* Good cause sufficient to have a successful unemployment-benefits claim is cause that would reasonably impel an average able-bodied, qualified worker to give up his employment. *Garrett v. Dir.*, 58 Ark. App. 7, 944 S.W.2d 865 (1997). Good cause depends not only on the good faith of the employee involved, which includes the presence of a genuine desire to work and to be self-supporting, but also depends on the reaction of an average employee. *Id.*

Fowlkes walked out after having been cursed by his employer when he stepped in to protect a coworker who was being belittled by the employer. Fowlkes argues that he did not quit but was terminated because he was told to leave the keys to the company truck when he walked out. He said that no one ever told him he was fired or told him to leave.



He walked off the job without permission and never returned. In his first application for unemployment benefits, he stated that there were a lot of things going on in his personal life having to do with illness in his family and that he did not need to be cursed at work. In his second application, Fowlkes stated that he guessed that he had quit when he told them that he did not "have to take this" and left. He also said that cursing was not unusual at his workplace, but he had not quit in the past. Therefore, the Board's decision that Fowlkes left his last work without good cause connected with the work must be affirmed because it is supported by substantial evidence.

IV. *Availability*

In his third point on appeal, Fowlkes claims that the Board erred in concluding that he was not available for work under Arkansas Code Annotated section 11-10-507 (Repl. 2012), which provides in part as follows:

> An insured worker shall be eligible to receive benefits with respect to any week only if the Director of the Department of Workforce Services finds that:
>
> (1) Claim for Benefits. He or she has made a claim for benefits with respect to such week in accordance with such regulations as the director may prescribe;
> . . .
>
> (3) Able to Work and Available for Work.
>> (A) The worker is unemployed, is physically and mentally able to perform suitable work, and is available for such work. Mere registration and reporting at a local employment office shall not be conclusive evidence of ability to work, availability for work, or willingness to accept work unless the individual is doing those things which a reasonably prudent individual would be expected to do to secure work. In determining suitable work under this section and for refusing to apply for or accept suitable work under § 11-10-515, part-time work shall be considered suitable work unless the majority of weeks of work in the period used to determine monetary eligibility is from full-time work.

Ark. Code Ann. § 11–10–507(1) and (3)(A).

Fowlkes argues that, even though he was grieving, he was still available for work, and he had made efforts to find employment even before he applied for benefits. Fowlkes maintains that he was terminated without cause, and following his discharge, his brother and father had died, requiring the care of his family but not precluding his availability for work. He contends that he completed his application as soon as possible. He also argues that if there were any errors in his application, he should not be disqualified because he relied on the agency intake person to help him complete the form. He contends that the agency should be estopped from profiting from an error made by him based on incorrect advice from the agency's agent. *See Ashcraft v. Hunter*, 268 Ark. 946, 597 S.W.2d 124 (1980).

The Department argues that no error occurred in finding that Fowlkes was not available for work under section 11–10–507(3)(A). From October 2, 2015, through November 21, 2015, Fowlkes was taking care of his father and his brother, who both passed away during this time period. Fowlkes testified that he would not have been able to work immediately after leaving his last employment due to his dad's illness. He also said that he was not able and available for work due to a death in the family, childcare, and other dependent arrangements. He testified that he did not begin to look for jobs until soon after November 26, 2015. Therefore, the Board did not err in finding that Fowlkes was not eligible for benefits due to his not being available for work.

V. *Delay in Filing Claim*

In Fowlkes's fourth and final point on appeal, he claims that the Board erred in concluding that his delay in filing his initial claim was without good cause or due to extraordinary circumstances. His reasons given for the delay were that he was "dealing with [his] dad and brother dying and things that were more important. . . ." He argues that this was an extraordinary circumstance, or alternatively, good cause. He contends that the Board gave his testimony short shrift by finding that he did not show by a preponderance of the evidence that the necessity of caring for his family members prevented him from filing a claim. He maintains that the reasons he gave for filing late were compelling. He also contends that without contrary evidence in the record, the Board should not have rejected his reason for the delay. He claims that the decision of the Board does not indicate that it found his credibility lacking.

He cites *Harris v. Director,* 2014 Ark. App. 163, where this court held that the director may waive the restrictions in Arkansas Administrative Code section 208.00.2-14(b)(G) (may be considered filed no earlier than fourteen days prior to date received) if he or she finds that extraordinary circumstances exist and equity and justice require such waiver. Fowlkes argues that he was without benefit of legal counsel and in the midst of an extraordinary circumstance with the death of his father and brother in short order. He claims that his delay in filing should be excused because equity and justice exist to excuse the delay in filing, or alternatively, due to good cause.

The Department contends that Fowlkes did not show good cause for backdating his claim, and the Board's decision must be affirmed. We agree. Fowlkes's final day of work

was October 20, 2015.  He filed his claim for unemployment insurance on December 14, 2015, once he became available to return to the workforce.  He asked that the claim be backdated to his last day of work.  Regulation 14(b)(G) states that if good cause is shown, an individual's claim may be backdated up to fourteen days.  He did not file his claim for fifty-five days after leaving his job.  Therefore, even though he was busy with family matters, it was reasonable for the Board to find that he could have found some time to file his claim before December 14, 2015.

Affirmed.

GRUBER, C.J., and BROWN, J., agree.

*Robert S. Tschiemer*, for appellant.

*Phyllis A. Edwards*, for appellee.

13